UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JUSTIN T. GARRIOTT and SUSAN GARRIOTT, husband and wife; JASPYN GARRIOTT, JUSTIN GARRIOTT JR., JMG1, a minor, and JMG2, a minor,<br><br>          Plaintiffs,<br><br>v.<br><br>WESTERN MEDICAL ASSOCIATES, PLLC, an Idaho corporation; PAUL PASCHALL, MD; ERIC CHUN, MD,<br><br>          Defendants. | Case No. 2:16-cv-00081-CWD<br><br>**MEMORANDUM DECISION AND ORDER**<br>**(Dkt. 86)** |

## INTRODUCTION

Before the Court is Defendants' motion for summary judgment filed on March 31, 2017, in this medical malpractice action brought against two emergency room physicians. Defendants argue the foundation for Plaintiffs' expert witnesses to testify regarding the applicable standard of care is factually and legally deficient. The sole issue before the Court is whether the opinions of Plaintiffs' experts as expressed in their reports are admissible in connection with Defendants' motion.

The parties filed responsive briefing and the Court conducted a hearing on July 11,

2017, at which the parties appeared and presented their arguments. After carefully

considering the parties' written memoranda, relevant case law, the expert witness reports

and other material filed by the parties, and the parties' arguments, the Court will deny

Defendants' motion for summary judgment.

## FACTS[1]

According to the complaint, Plaintiffs Justin T. Garriott and Susan Garriott are

husband and wife, and they have four children. They reside together in Spokane County,

Washington.

On March 25, 2015, Plaintiff Justin Garriott went to an urgent care clinic, with

symptoms of body aches, fever, and dry cough that had been ongoing for two weeks.

(Dkt. 88-3 at 2.) The urgent care physician diagnosed acute bronchitis and advised Mr.

Garriott to treat with Tylenol and ibuprofen. When his condition did not improve, but

worsened, Mr. Garriott went to the emergency department at Kootenai Health Hospital

two days later, on March 27, 2015. (Dkt. 88-3 at 6.) At this visit, Dr. Perschau attended to

Mr. Garriott, who was complaining of fever, neck stiffness, back pain, and abdominal

pain. Based on his evaluation and review, Dr. Perschau reached a diagnosis of viral

meningitis, dispensed several prescriptions, and advised further follow up with a primary

care physician. (Dkt. 88-3 at 2.)

---

[1] The parties each submitted their own statement of facts in support of their motion and response brief.
None of the facts set forth in either statement conflicted with the other, as the parties focused their
arguments on different parts of the record. Accordingly, the following facts appear to be undisputed
unless noted otherwise.

The following day, Mr. Garriott felt significantly worse, but "because they told me [the infection] could take two weeks, I was trying to be a trooper and let it run its course, but it just became too much to bear, and I just didn't feel like it was within reason of something I could handle." (Dkt. 88-3 at 24.) On March 31, 2015, Mr. Garriott returned to the emergency room at Kootenai Health. (Dkt. 88-3 at 8.) He conveyed to Dr. Paschall that he had aching in his back that also radiated into his abdomen. Dr. Paschall's impression was that Mr. Garriott had acute thoracic back pain, as well as a viral illness and resolving viral meningitis. (Dkt. 88-3 at 9.) Dr. Paschall prescribed additional pain medication and advised follow up with a primary care physician.

Mr. Garriott continued to have pain the following day on April 1, 2015, despite taking the prescribed medications, but he already had an appointment set with a primary care physician for April 2. (Dkt. 88-3 at 27.) On the morning of April 2, 2015, as he readied himself for that appointment, he started experiencing feelings of numbness in his lower extremities. (*Id.*) He phoned the physician's office and was advised to go to the hospital. (*Id.*) Because he did not feel he could ambulate the stairs of his house or get himself to the hospital, his wife called for an ambulance. (Dkt. 88-3 at 27.)

At this third emergency room visit to Kootenai Health, Dr. Chun attended to Mr. Garriott and concluded the most likely mechanism behind his presenting complaints was an epidural hematoma on the lumbar or thoracic spine. Dr. Chun ordered a lumbar MRI, which was read as essentially normal. (Dkt. 88-3 at 13.)

Mr. Garriott recalled the following discussion with Dr. Chun at the ER visit of April 2:

[Dr. Chun] came back ...I would say it was around 5:00...And he told me, well, it seems like everything is checking out, and I don't know what's going on, so we are going to look to get you out of here. And I remember being dumbfounded, and looking at my wife because I came in, not on my own strength, the numbness was going up, and he was talking about discharging me from the hospital.

The testimony continued,

And so I'm like, what are you talking about. I can't feel my legs. I don't understand. It wasn't computing to me how he was even entertaining the thought of sending me home. And so I said, I'm not leaving. I'm not leaving here until you tell me what's going on.

(Dkt. 88-3 at 28-29.)

Dr. Chun admitted Mr. Garriott to the hospital on April 2, 2015. Following Mr. Garriott's admission to the hospital, a thoracic MRI study was ordered and completed, and read shortly before 5:00 a.m. the following day, April 3. This MRI depicted an undefined lesion / mass at T7. (Dkt. 88-3 at 10, 11.) A neurosurgical consult was then ordered, and after further emergent workup, Mr. Garriott underwent an emergency decompressive laminectomy that morning to relieve pressure on his spine. (Dkt. 88-3 at 13-14.)

Despite this surgery, Mr. Garriott has irreversible injury to his spinal cord and has been rendered a paraplegic. (Dkt. 88-3 at 15-17.) Plaintiffs filed this medical malpractice action on February 24, 2016.

**Expert Disclosures**[2]

In January of 2017, Plaintiffs provided Defendants with their expert witness disclosures and reports, which identified Richard Cummins, M.D. and Kayur Patel, M.D., as standard of care experts. (Dkt. 86-3 at 2.) Dr. Cummins is currently the Professor of Medicine at the University of Washington, and an attending physician providing emergency medical services at University Hospital in Seattle. He is board certified in both internal medicine and emergency medicine. Dr. Cummins signed his report on December 14, 2016.

Dr. Patel is trained in both emergency medicine and internal medicine, and board certified in emergency medicine. He is licensed in Michigan, Tennessee, Kentucky, Indiana, Illinois, Virginia, and Georgia, and currently is on staff as an emergency room physician at Baptist Health Paducah in Paducah, Kentucky. In addition, Dr. Patel is a consultant for emergency medical care to several emergency departments in the United States. Dr. Patel signed his report on December 9, 2016.

Neither Dr. Cummins nor Dr. Patel have practiced medicine in Kootenai County or within the State of Idaho. In their expert witness reports, both physicians indicated that, to familiarize themselves with the applicable standard of care, they reviewed all of the medical records regarding Mr. Garriott's care, and read the depositions of Justin Garriott, and Drs. Chun, Paschall, Perschau, and Reichel. They also spoke to Dr. Eric

---

[2] Plaintiffs' expert witness reports, signed by each expert, are found in the record at Docket 86-4 and 86-5. Defendants confirmed they did not depose Plaintiffs' experts, and there are no affidavits in the record. Accordingly, the Court will treat the reports the same as if they were affidavits at this stage.

Johnson, a board certified family physician having practiced or currently practicing emergency medicine at facilities in Boise, Idaho; Meridian, Idaho; Driggs, Idaho; and Emmett, Idaho.

Although neither physician indicated which portions of the depositions they specifically relied upon, Plaintiffs provided excerpts from the physicians' depositions, which are discussed below. Thereafter, the Court will review the substance of the expert witness' telephone conversation with Dr. Johnson.

**Dr. Chun's Testimony[3]**

Dr. Chun is board certified in emergency medicine by the American College of Emergency Physicians. Chun Depo. at 11. The physician group with whom Dr. Chun practices, Western Medical Associates, is the only group of emergency physicians in Kootenai County, Idaho, and Western Medical Associates is the exclusive provider of emergency room services at Kootenai Health. *Id*. at 13. The standard of care Dr. Chun adhered to from 1995 to 2000 in Evansville, Indiana, prior to moving to Idaho and joining Western Medical Associates, for diagnosing and treating cauda equine syndrome, cord compression, or spinal epidural abscesses is no different than the standard of practice he adheres to in Coeur d'Alene, Idaho. *Id*. at 17-18.

Dr. Chun characterized Mr. Garriott's presentation to the ER on April 2, 2015, as follows: "I think it is compelling that on the third visit to our ER, knowing that he had been several times prior to that, that he wasn't able to walk and that he was profoundly

---

[3] Dr. Chun's deposition, taken on September 26, 2016, is in the record at Docket 88-3, pages 31 – 49. The Court will refer to the page numbers of Dr. Chun's deposition.

weak. I think there's nothing more compelling than the weakness and inability to walk." *Id*. at 25-26. Dr. Chun listed the symptoms heralding concern for an epidural abscess as "pain, numbness, weakness, anesthesia and bowel or bladder changes." *Id*. at 27-28. An MRI is the most important diagnostic tool for diagnosing an epidural abscess. *Id*. at 35.

Mr. Garriott complained of pain in his abdomen and low back. *Id.* at 71-72. Due to concern for a spinal lesion, Dr. Chun's "immediate response" on April 2, 2015, was to order an MRI. *Id*. at 63; *see also id*. at 49, 42 (questioning Dr. Chun regarding Mr. Garriott's April 2, 2015 visit to the emergency department). Dr. Chun ordered a lumbar spine with thoracic views. He recounted the verbal order as follows: "I told [the Unit Coordinator] I needed to order an MRI of the lumbar spine and to include lower thoracic views…." *Id*. at 82; *see also id*. at 81 (describing the role of the Unit Coordinator).

Dr. Chun acknowledged the accuracy of the written transcription of his order, which states, "4/02/15 12:53 MRI Spine Lumbar w/o Cont Stat. Reason for Exam:: lower ext weakness/ r/o caudaequina syndrome. Additional Instructions:: check out lower thoracic." *Id.* at 87; *see also* Dkt. 88-4 at 2 (written order dated April 2, 2015 at 12:53). Dr. Chun's predominant concern was that Mr. Garriott had "some form of spinal cord defect, injury or process." *Id.* at 64 – 65. Dr. Chun's suspicions were not limited to the lumbar spine, but also included the lower thoracic spine. *Id.* at 65. Dr. Chun "was already concerned" about a thoracic problem on April 2, 2015, after initially examining Mr. Garriott. *Id.* at 66-67. Dr. Chun "believed that [Mr. Garriott] had profound neurologic symptoms, and [therefore] was compelled to order the MRI." *Id.* at 68. The MRI was to be ordered "stat." *Id.* at 69. To Dr. Chun, a stat MRI means "a high priority

or highest priority." *Id.* at 78. Dr. Chun viewed Mr. Garriott's condition as "an emergency." *Id.* at 77. Dr. Chun ordered the MRI "well prior" to 12:53 p.m. on April 2, 2015. *Id.* at 81.

The radiology report was completed at 5:05 p.m. on April 2, 2015. *Id.* at 106. At that time, Dr. Chun did not review the report. *Id.* at 106. Upon hearing the MRI study he ordered was normal, Dr. Chun's differential shifted away from a space-occupying lesion in the "lower spine," and he began to consider other possibilities. *Id.* at 113-14.

Radiologists are available to read or consult on MRI studies taken at Kootenai Health on a 24-hour basis. *Id.* at 116-17. Dr. Chun ceased being Mr. Garriott's attending physician when he had completed his care, which he recollected as having been "sometime after 5:00, before 6:00 or 6:30," in the early evening of April 2, 2015. *Id.* at 135. Dr. Chun later learned that the MRI study had lumbar-only views with no contrast. *Id.* at 105.

Dr. Chun admitted that, had he looked at the radiology report, he would have ordered thoracic views of the spine. *Id.* at 106-107. Moreover, Dr. Chun believed that, had thoracic studies been ordered, the thoracic epidural abscess would have been diagnosed. *Id.* at 107. Dr. Chun testified also that, had the thoracic spine been included on the MRI, more likely than not, the abscess would have been discovered. *Id.* at 107-108.

**Dr. Paschall's Testimony[4]**

Dr. Paschall was employed by Western Medical Associates from July of 1992 through July of 2015. Paschall Depo. at 10. In 2015, the physicians employed by Western Medical Associates did not provide emergency room services to any facilities other than Kootenai Health. *Id.* at 11. Dr. Paschall did not have hospital privileges at any hospital other than Kootenai Health. *Id.* at 13. The physicians at Western Medical Associates, whether board-certified in family practice or emergency medicine, did not differ in the way they practiced emergency medicine in 2015. *Id.* at 12-13. Dr. Paschall had previously practiced emergency medicine at hospitals in Jackson, Tennessee, and in Kellogg, Idaho, and testified that the standard of care or standard of practice for the diagnosis and treatment of cauda equine syndrome, spinal epidural abscess, or cord compression generally, was basically the same at those facilities as it was at Kootenai Health back in March and April of 2015. *Id.* at 13-14.

Dr. Paschall was the attending emergency room physician on March 31, 2015, and saw Mr. Garriott. *Id.* at 29-30. In conjunction with treating Mr. Garriott, Dr. Paschall spoke with Dr. Perschau about Dr. Perschau's meningitis diagnosis from March 27, 2015, because Mr. Garriott's symptoms were different on presentation on March 31, 2015. *Id.* at 31-35. Mr. Garriott's presenting complaints on March 31, 2015, were backache and abdominal pain. *Id.* at 35.

---

[4] Dr. Paschall's deposition was taken on September 27, 2016, and is found in the record at Docket 88-4, pages 5-15. The Court will refer to the page numbers of the deposition.

The emergency note for the visit on March 31, 2015, recorded the chief complaint as: back pain, aching in the back, and radiating pain into the abdomen. *Id.* at 40, 43. Dr. Paschall noted tenderness in Mr. Garriott's thoracic area and documented his impression that Mr. Garriott was suffering from "acute thoracic back pain." *Id.* at 44.

Dr. Paschall testified he performed a neurologic exam of muscle strength and reflexes, but failed to record it. *Id.* at 46-47. He believed the cause of Mr. Garriott's thoracic back pain was "[m]uscle strain [or] chronic pain," but he was not sure. *Id.* at 56. Dr. Paschall believed also Mr. Garriott simply had a resolving case of viral meningitis. *Id.* at 54.

According to Dr. Paschall, when a physician has a concern for a disease process in the lumbar or thoracic spine, the physician will order both a lumbar and thoracic MRI study. *Id.* at 73. A lumbar MRI study obtained at Kootenai Health would include at least T12 (and, at most, T11). *Id.* Dr. Paschall agreed that, if an ER physician wanted to see the thoracic spine on MRI, he/she would specifically order a thoracic MRI. *Id.* at 74. It is typical for Dr. Paschall to review the study and the radiologist's interpretation of the same for all MRIs he orders. *Id.* at 75.

**Dr. Perschau's Testimony[5]**

A third physician affiliated with Western Medical Associates, Dr. Perschau, was also deposed. He has been involved in several cases involving spinal epidural abscesses. Perschau Depo. at 17. The typical signs and symptoms of a spinal epidural abscess are

---

[5] Dr. Perschau's deposition was taken on September 8, 2016, and is found in the record at Docket 88-4, pages 17-36. The Court will refer to the page numbers of the deposition.

"weakness in the legs, numbness, tingling in the legs, pain in the midline of the back, fever, abnormal clotting studies." *Id.* at 18. A patient with an epidural abscess represents a "ticking clock," in which a physician is trying to get "people involved and studies done" before it is too late. *Id.* at 20. A physician suspicious of spinal epidural abscess would order an MRI with and without contrast. *Id.* at 22 - 23. If he had a suspicion of an epidural abscess, he would also perform neural testing— sensation, strength and reflexes. *Id.* at 23.

For an emergent MRI ordered at Kootenai Health, it would typically take between 30 to 90 minutes to have the results. *Id.* at 62-63. For an MRI to include the thoracic spine, a separate study of that portion of the spine would be ordered. *Id.* at 63 – 65. If presented with a 36-year-old male with a 3 to 4-day history of pain in the thoracic region with increasing weakness in his lower extremities, difficulty urinating, numbness/weakness in his groin, normal patellar and Achilles reflexes, but difficulty in ambulating, Dr. Perschau would order a thoracic MRI with contrast. *Id.* at 71 - 72. On occasions when Dr. Perschau orders an MRI through the unit coordinator, he checks the order a "few minutes later just to make sure it's the right thing." *Id.* 73 - 74.

**Dr. Reichel's Testimony[6]**

Dr. Taylor Reichel is a neuroradiologist practicing at Kootenai Health, and was on call at the hospital on April 2, 2015. Reichel Depo. at 20, 36. Regarding imaging studies ordered out of the emergency room, Dr. Reichel explained:

---

[6] Dr. Reichel's deposition was taken on October 17, 2016, and is found in the record at Docket 88-4, pages 24 – 36. The Court will refer to the page numbers of the deposition.

[E]verything falls under the 'stat'…So it's a common gripe in the medical world and in radiology specifically that 'stat' has become this term that has lost its meaning. Because basically every single image that is performed from the emergency room is 'stat,' but they all have varying levels of urgency that . . . sometimes require added communication to sort of determine. But things that come out of the emergency room, we put them… in the list and we make them our priority. So there's not really…an 'Urgent' and an 'Emergent.' I think there's just a 'Stat.'

*Id.* at 19-20; 28.

While there is variability in how long it takes from the time an MRI is ordered until one has been taken and the report completed, Dr. Reichel indicated 87 minutes is a reasonable time frame. *Id.* at 22-24; and 32 -34 (indicating that 90 minutes would be the expected turnaround time for an MRI ordered on a slow day in the emergency department or on a weekend). Dr. Reichel described the study completed on Mr. Garriott on April 2, 2015, ordered by Dr. Chun as follows:

> **Q.** [D]id the study include checking out the lower thoracic?
> **A.** Yes.
> **Q.** How so?
> **A.** Well, . . .one of the sequences specifically she looked from T10, T11, T12, at the lower thoracic spine. And I would say that every MRI that we do of the lumbar spine includes a portion of the lower thoracic spine.
> **Q.** Why is that?
> **A.** It's basically to get the full coverage of the area… [I]n a lumbar spine MRI, you include the lower thoracic and the upper sacrum. It's just routine.

*Id.* at 46-47.

According to Dr. Reichel, the standard of practice and understanding among the radiologists who practice

at Kootenai Health is that the mid thoracic spine encompasses T5 through T9. *Id.* at 48-49. A spinal lesion can best be visualized on an MRI study when it is obtained with and without contrast. *Id.* at 49 – 51. The same is true for viewing an epidural abscess. *Id.* at 52.

When describing his understanding of Dr. Chun's order, Dr. Reichel testified he understood the physician was "worried about what we call the thoracolumbar region, sort of just that junction between the thoracic spine and the lumbar spine." *Id.* at 52 – 53. Dr. Reichel interpreted Dr. Chun's order as reflecting that Dr. Chun was interested in the lower thoracic spine only. *Id.* at 55. Dr. Reichel testified that a physician concerned about a disease process in the thoracic and lumbar spine "would order a thoracic MRI and a lumbar MRI," and explained that an MRI must be tailored to a certain anatomic region. *Id.* at 56, 57. Otherwise, "[i]f you spread [the field] too much, you basically make it an uninterpretable examination." *Id.* at 58.

Dr. Chun viewed Mr. Garriott's imaging at 4:30 and at 4:45 pm on April 2, 2015. *Id.* at 66-67. At 5:05 pm on April 2, 2015, Dr. Reichel electronically signed the radiology report for the lumbar imaging ordered by Dr. Chun. *Id.* at 45 and Dkt. 88-4 at 35.

**Telephone Call with Dr. Eric Johnson**

Drs. Cummins and Patel both spoke by telephone with Eric Johnson, M.D., a board certified family physician, who is an emergency department physician having practiced at St. Alphonsus Medical Center in Boise and Nampa; St. Luke's Regional Medical Center in Boise and Meridian; Teton Valley Hospital in Driggs, Idaho; and Southwest Emergency Department at Walter Knox Memorial Hospital in Emmett, Idaho.

Both expert witnesses stated in their reports that Dr. Johnson indicated he provided emergency care at Kootenai Health, Coeur d'Alene, Idaho, in the past.[7]

Dr. Johnson informed Drs. Cummins and Patel that his background, education, and training is similar to that of Drs. Perschau, Paschall, and Chun, in that they all practice emergency medicine, they are licensed physicians in the state of Idaho, and they have all practiced in both rural and suburban areas.

During the phone call, Drs. Cummins and Patel discussed the diagnosis, care, and treatment of patients presenting with symptoms, signs and a medical history similar to those Justin Garriott presented with on March 25, 2015, March 31, 2015, and April 2, 2015.

Drs. Cummins and Patel both stated the following in their reports:

> After having reviewed this information, and based upon my own education, training, and experience, I believe I have actual knowledge of the applicable standard of care pertinent to the facts of this case….I hereby attest that the standard of care for evaluations and treatment of a patient presenting to an emergency department with the medical history, physical examination, and signs and symptoms similar to Justin Garriott's on March 31, 2015 and April 2, 2015 are the same in the Idaho communities of Boise, Nampa, Driggs, Emmett, Coeur d'Alene and are the same … throughout the United States.

In their reports, both Dr. Cummins and Dr. Patel expressed his opinion that Dr. Paschall and Dr. Chun should have ordered a thoracic MRI with contrast when they treated Justin Garriott on March 31, 2015, and April 2, 2015.

---

[7] This statement was later determined to be untrue, the implications of which the Court will discuss.

Defendants' expert witnesses opine there was nothing about the March 31, 2015 emergency department visit by Justin Garriott that would have compelled Dr. Paschall to pursue a diagnosis of spinal epidural abscess or prompted him to have ordered an MRI on any part of the spine. Similarly, Defendants' expert witnesses opine that Dr. Chun was appropriately concerned with Garriott's lumbar spine given his diagnosis of acute cauda equine syndrome.

## DISCUSSION

### 1.     Standard of Review

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure. Rule 56 provides, in pertinent part, that judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "material" if it affects the outcome of the litigation and may be considered "genuine" if it is established by "sufficient evidence supporting the claimed factual dispute ... to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Hahn v. Sargent*, 523 F.3d 461, 464 (1st Cir. 1975) (quoting *First Nat'l Bank v. Cities Serv. Co. Inc*., 391 U.S. 253, 289 (1968)); *see also British Motor Car Distrib. v. San Francisco Auto. Indus. Welfare Fund*, 883 F.2d 371 (9th Cir. 1989).

According to the Court of Appeals for the Ninth Circuit, to withstand a motion for summary judgment, a party

(1) must make a showing sufficient to establish a genuine issue of fact with
respect to any element for which it bears the burden of proof; (2) must
show that there is an issue that may reasonably be resolved in favor of
either party; and (3) must come forward with more persuasive evidence
than would otherwise be necessary when the factual context makes the non-
moving party's claim implausible.

*British Motor Car*, 882 F.2d at 374 (citation omitted). When applying this standard, the

court views all of the evidence in the light most favorable to the non-moving party.

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986); *Hughes v. United States*, 953

F.2d 531, 541 (9th Cir. 1992).

The admissibility of expert testimony, however, is a threshold matter distinct from

whether the testimony raises genuine issues of material fact sufficient to preclude

summary judgment. *Arregui v. Gallegos-Main*, 291 P.3d 1000, 1003 (Idaho 2012). The

liberal construction and reasonable inferences standard does not apply when deciding

whether testimony offered in connection with a motion for summary judgment is

admissible. The Court must look at the witness' affidavit or deposition testimony and

determine whether it alleges facts which, if taken as true, would render the testimony of

that witness admissible. *Id.*

To avoid summary judgment for the defense in a medical malpractice case,

Plaintiffs "must offer expert testimony indicating that the defendant health care provider

negligently failed to meet the applicable standard of health care practice." *Dulaney v. St.*

*Alphonsus Regional Med. Ctr.*, 45 P.3d 816, 820 (Idaho 2002).[8] If the Court resolves the

threshold issue of admissibility under Fed. Rule Civ. P. 56, the Court need not reach the

---

[8] Idaho Code § 6-1012 states:

> In any case, claim or action for damages due to injury to or death of any person, brought against any physician and surgeon or other provider of health care, including, without limitation, any dentist, physicians' assistant, nurse practitioner, registered nurse, licensed practical nurse, nurse anesthetist, medical technologist, physical therapist, hospital or nursing home, or any person vicariously liable for the negligence of them or any of them, on account of the provision of or failure to provide health care or on account of any matter incidental or related thereto, such claimant or **plaintiff must,** as an essential part of his or her case in chief, **affirmatively prove by direct expert testimony** and by a preponderance of all the competent evidence, **that such defendant** then and there **negligently failed to meet the applicable standard of health care practice of the community** in which such care allegedly was or should have been provided, as such standard existed at the time and place of the alleged negligence of such physician and surgeon, hospital or other such health care provider and as such standard then and there existed with respect to the class of health care provider that such defendant then and there belonged to and in which capacity he, she or it was functioning. Such individual providers of health care shall be judged in such cases in comparison with similarly trained and qualified providers of the same class in the same community, taking into account his or her training, experience, and fields of medical specialization, if any. If there be no other like provider in the community and the standard of practice is therefore indeterminable, evidence of such standard in similar Idaho communities at said time may be considered. As used in this act, the term "community" refers to that geographical area ordinarily served by the licensed general hospital at or nearest to which such care was or allegedly should have been provided.

(emphasis added).

question whether Defendants failed to meet the standard of care under Idaho Code § 6-1013, as that issue is not before the Court.[9]

## 2. Admissibility of Plaintiffs' Expert Reports

Defendants argue Plaintiffs' experts failed to acquire actual knowledge of the applicable standard of care, either by reviewing the deposition transcripts of Drs. Chun, Paschall, Perschau and Reichel, or via their telephone conversation with Dr. Johnson. The Court will discuss each contention in turn.

### A. *Deposition Review*

An out-of-area expert witness may become familiar with the local standard of care by reviewing a defendant doctor's deposition, *Rodehouse v. Stutts*, 868 P.2d 1224, 1228 (Idaho 1994), or by speaking to local physicians confirming the local standard is the same as a national standard, *Suhadolnik v. Pressman*, 254 P.3d 11, 18 (Idaho 2011). If an out-of-area expert relies solely upon review of a deposition, the expert's review of a deposition stating that the local standard does not vary from the national standard, coupled with the expert's personal knowledge of the national standard, is sufficient to lay

---

[9] Idaho Code § 6-1013 states:

> The applicable standard of practice and such a defendant's failure to meet said standard must be established in such cases by such a plaintiff by testimony of one (1) or more knowledgeable, competent expert witnesses, and such expert testimony may only be admitted in evidence if the foundation therefor is first laid, establishing (a) that such an opinion is actually held by the expert witness, (b) that the said opinion can be testified to with reasonable medical certainty, and (c) that such expert witness possesses professional knowledge and expertise coupled with actual knowledge of the applicable said community standard to which his or her expert opinion testimony is addressed; provided, this section shall not be construed to prohibit or otherwise preclude a competent expert witness who resides elsewhere from adequately familiarizing himself with the standards and practices of (a particular) such area and thereafter giving opinion testimony in such a trial.

a foundation for the expert's opinion. *Perry v. Magic Valley Regional Med. Ctr.*, 998 P.2d 816, 821 (Idaho 2000). *See also Suhadolnik*, 254 P.3d at 19 (The deposition "testimony must clearly articulate the local standard for the particular time, place and specialty at issue in order to meet the foundational requirements of Idaho Code § 6-1013.").

Plaintiffs argue the deposition testimony of Drs. Chun, Perschau, Paschall, and Reichel provided a sufficiently detailed narrative and description of the applicable practices and standards of care in existence at Kootenai Health between March and April of 2015 for the emergency room physicians who treated Justin Garriott. On the other hand, Defendants contend that, based upon their expert's opinion that a thoracic MRI was not indicated, the deposition testimony is inconclusive regarding the standard of care. Additionally, Defendants assert the questions posed to the physicians by Plaintiffs' counsel which elicited the opinions that a thoracic MRI was indicated, presupposed the diagnosis of a spinal epidural abscess.

Upon review of the depositions, the Court finds that, taken together as a whole, the four depositions provide a complete picture of the standard of care applicable to the emergency room physicians for someone presenting to Kootenai Health with symptoms similar to those of Mr. Garriott on March 31, and April 2, 2015. First, the fact Plaintiffs' counsel did not ask the deposed physicians, "is this the standard in the community," is not fatal to reliance by Drs. Patel and Cummins on the physician testimony they reviewed. *Samples v. Hanson*, 384 P.3d 943, 947 (Idaho 2016) (stating experts are not confined to using a formulaic process or must include particular phrases to establish

adequate foundation under Idaho Code § 6-1013); *Kozlowski v. Rush*, 828 P.2d 854, 858 (Idaho 1991) (reversing lower court decision to strike expert affidavits for failure to use "[t]he magic words.").[10] Thus, Plaintiffs' experts are entitled to rely upon the testimony as a whole, and it need not contain a scripted question and answer to establish the local standard of care.

Second, the deposition testimony established the local standard of care for board certified emergency room physicians practicing in Coeur d'Alene, Idaho, in 2015, was the same in locales outside of Idaho. For example, Dr. Chun was asked whether the standard of care he adhered to from 1995 to 2000 in Evansville, Indiana, prior to moving to Idaho and joining Western Medical Associates, for diagnosing and treating cauda equine syndrome, cord compression, or spinal epidural abscesses, was any different than the standard of practice he adhered to in Coeur d'Alene, Idaho. Dr. Chun answered, "No." Even though the question was phrased as of the time he moved to Idaho in 2005, it would be difficult to extrapolate that the standard in 2015 would be lower than it was as of an earlier time period.

Similarly, Dr. Paschall was asked about the areas in which he had practiced. He indicated he had practiced in Tennessee, and in Kellogg, Idaho, and that the standard of care for the diagnosis and treatment of cauda equine syndrome, spinal epidural abscess, or cord compression generally was the same in those facilities as it was at Kootenai

---

[10] And, when asked at the hearing on the motion whether Plaintiffs' counsel had ever received a favorable answer to such a question, counsel informed the Court that a deponent would generally be instructed not to answer the question.

Heath in March and April of 2015. Taken together, the testimony of Drs. Paschall and Chun indicate that the standard of care they had adhered to elsewhere for treating the three identified conditions was no different than at Kootenai Health.

The manner in which Plaintiffs have framed the issue suggests this is not a complicated standard of care. Plaintiffs' experts believe the facts called for a diagnostic MRI of the thoracic spine; neural testing of sensation, strength and reflexes; and recognition that the MRI should have been placed at the top of the list due to the emergent nature of Mr. Garriott's condition. Defendants' expert, Dr. Milne, similarly states the issue is whether an MRI should have been ordered. (Dkt. 86-8 at 15-16.)[11] At trial, the issue will be that for a battle of the experts, with the outcome determined by the jury.

Defendants rely upon *Suhadolnik* for their argument that the deposition review here by the expert witnesses was insufficient to establish actual knowledge of the applicable standard of care. But in *Suhadolnik*, the expert reviewed only one deposition of the sole treating physician, and did not consult with another Idaho physician. In that case, the court found the deposition testimony of the treating physician inconclusive regarding the local standard of care or the existence of a national standard of care, and excluded the testimony. *Suhadolnik*, 254 P.3d at 20. In contrast to *Suhadolnik,* the experts

---

[11] Dr. Milne's report indicated that, "in the evaluation of back pain without focal neurological deficits on physical exam that would be suggestive of an acute spinal cord lesion, standard of care does not mandate that a physician obtain a contrast enhanced MRI of the spine."

in this matter reviewed four depositions of each of Garriott's treating physicians, <u>and</u> spoke with Dr. Johnson.

**B.**    *Telephone Converstation with Dr. Johnson*

Turning now to the phone conversation with Dr. Johnson, it is important to note that experts may become familiar with the local standard of care by review of deposition testimony, <u>or</u> a phone call. *See Grover v. Smith*, 46 P.3d 1105, 1109 (Idaho 2002) (explaining either a phone call with a local specialist or review of a deposition is sufficient). Here, Drs. Patel and Cummins did both.

Additionally, Defendants provided the entirety of Dr. Johnson's deposition in an unrelated case, which, although not available to Drs. Patel and Cummins, provided the Court with information about Dr. Johnson's experience, education, training and background. He was deposed on February 8, 2016, in the case of *Howarth v. Boundary County*, Case No. 2:14-cv-312-REB; Dr. Johnson was retained as an expert to opine on the standard of health care practice in January of 2014 in the area ordinarily served by Boundary Community Hospital. Dr. Johnson testified he had practiced emergency medicine for 20 years throughout southern and eastern Idaho, and had practiced his entire career in Idaho in not only Level II trauma centers, but also in 13-bed critical care access hospitals. He indicated he felt "fairly comfortable testifying as to the standard of care in critical care access hospitals." (Dkt. 86-6 at 3.)

Dr. Johnson stated there is a "federal mandate for the standard of care for emergency care." (Dkt. 86-6 at 4.) In other words, the statute dictates that emergency room physicians are required to perform necessary screening exams to rule out limb and

life-threatening medical emergencies. *Id.* In his opinion, that standard of care would necessitate a medical screening examination and an appropriate workup, "whether it's Bonners Ferry or Driggs, Idaho, or Emmett or Arco, that in an emergency department that standard of care would apply." *Id.* Dr. Johnson testified federal law mandates an ER physician "do the necessary testing to rule out emergency medical conditions." *Id.*

Dr. Johnson provided the following example under the facts in *Howarth*, which involved a man brought to the emergency room complaining of respiratory symptoms indicative of either bronchitis or pneumonia:

> **Q:** What does EMTALA require that a medical screening exam consist of?
> **A:** To do the necessary testing to rule out emergency medical conditions. That's the language. So that may mean that you have someone who has chest pain, and they may have to go all the way through an angiogram to rule out that they didn't have an acute coronary syndrome. If you can do that short of EKG, laboratory, everything else, that's great. If you can't, you're obligated to rule out those emergency medical conditions.
> **Q:** In this case what emergency medical conditions needed to be ruled out?
> **A:** Well, I think that a gentleman, in my review of the emergency record, who's potentially a gentleman who --- again, I'm not going to repeat myself but basically has had an illness for a period of time, seen two days prior to an emergency department visit, with kind of potentially upper-respiratory-type symptoms and then two days later now presented with lower respiratory symptoms. I think if I recall the records correctly, kind of a sinusitis diagnosis on the 21st, if my memory serves me correctly.
>
> On the 23rd seen in the emergency department he now presented with a significantly --- what I perceived as a significantly productive cough. He certainly was hypoxic at that point and complaining of, you know, symptoms and to be ---found to be somewhat tachycardic. And I think at that point he needed a workup to rule out emergency medical pulmonary conditions. That would be, I would believe, the standard of care.

****

It is my clinical opinion that the sensitivity of looking at lower respiratory, rule out infections or other processes, the highest sensitivity specificity test one can do is a simple chest X-ray.

(Dkt. 86-6 at 4-5.)[12]

Later on in his testimony, Dr. Johnson testified he works "all over the world" and interacts with EMS personnel all over the state of Idaho:

So I definitely know Idaho medicine, I think I can say pretty well, as well as medicine in general. I certainly know that with Idaho's local standard of care, whether I was in Boise, Idaho, or Coeur d'Alene or Bonners Ferry or anything, this particular approach to this patient is defined--- for example I would love to hear if there's a really different standard of care by a board certified emergency physician who --- that's contrary to the American Academy of Family Practice and ATA and other guidelines regarding that, because I would think that that would not be the best thing for Bonners Ferry.

(Dkt. 86-6 at 5.) In other words, community standards of care cannot fall below minimum standards, either set nationally or statewide. *See, e.g., Grover v. Smith*, 46 P.3d 1105, 1110 (Idaho 2002).

And, although he denied ever practicing in Coeur d'Alene, Idaho, when asked if he had ever done anything to familiarize himself with the standard of health care practice for an emergency physician practicing in Coeur d'Alene, he answered:

I have been in Coeur d'Alene. I know these guys. The fact is I have not worked there. I believe in this kind of case your local standard of care in Idaho is---is really a ---more of a---I don't believe that---let me put it, I don't believe Boundary County Hospital is going to do anything different than Coeur d'Alene should do anything different than Arco, than Driggs, than Emmett, than Weiser. I believe a gentleman who comes in with these

---

[12] In *Howarth*, the patient presented to the ER with wheezes and diffuse rhonchi, and to rule out pneumonia ---a potentially life-threatening condition---Dr. Johnson indicated a chest X-ray should have been ordered. Instead, the defendant physician did not ask for a chest X-ray, diagnosed acute bronchitis, and prescribed antibiotics for that condition. The patient later died of pneumonia. (Dkt. 86-6 at 10.)

> kinds of symptoms in any of these facilities warrants a chest X-ray after
> this history and physical examination.

(Dkt. 86-6 at 17-18.)

Defendants attempt to impeach Drs. Cummins and Patel, as they both stated in their reports that Dr. Johnson had "provided emergency care at Kootenai Health, Coeur d'Alene, Idaho in the past." Defendants imply Dr. Cummins and Dr. Patel were not truthful, because for the statement to be true, Dr. Johnson would have had to have practiced in Coeur d'Alene sometime between February 8, 2016, the date of the deposition in *Howarth*, and at the latest, December 9, 2016, the date Dr. Patel prepared his report, yet the relevant time period here is in March and April of 2015.

However, the court in *Dunlap ex. Rel. Dunlap v. Garner*, 903 P.2d 1296, 1302 (Idaho 1994), expressly rejected such an approach. There, the out of town expert claimed he spoke with two physicians to learn the local standard of care, both of whom disavowed ever speaking to the expert. The Idaho Supreme Court held it was error for the trial court to exclude the expert's affidavit on a motion for summary judgment on the grounds that it was not truthful relative to the averred conversations with the two local physicians. *Id.* The Court is therefore limited to looking at the affidavits (or in this case, the expert witness reports) themselves and determining whether they allege facts which, if taken as true, would render the evidence admissible. *Id.*

Here, the Court is not privy to when the conversation or conversations with Dr. Johnson and Drs. Cummins and Patel occurred, nor has the Court been provided with anything other than the two expert reports. Based upon the expert witness reports, the

Court's review of the deposition testimony of Drs. Chun, Paschall, Perschau, and Reichel, and the deposition testimony in *Howarth* relevant to Dr. Johnson's background, the Court finds Plaintiffs' experts provided sufficient foundation for the admissibility of their opinions regarding the applicable standard of health care for emergency room physicians as it existed in March and April of 2015, in Kootenai County.

Drawing all inferences in favor of Plaintiffs, as the Court must, and based upon the signed expert reports, the Court can reasonably infer the conversation with Dr. Johnson included a discussion of the facts, coupled with Dr. Johnson's background, education and training throughout Idaho, which Dr. Johnson indicated was similar to the education and training Drs. Paschall and Chun received. Based upon that conversation, as well as their review of the deposition testimony in this case, Drs. Cummins and Patel believed they had familiarized themselves sufficiently regarding the standard of care related to the medical treatment of Mr. Garriott in this case. Further, both expert witnesses stated the standard of care regarding a patient presenting with symptoms similar to Mr. Garriott's would have been the same anywhere in the United States—in other words, a national standard of care.[13]

Next, Defendants' interpretation of the case law on this issue does not persuade the Court otherwise. The Court has already distinguished the facts in *Suhadolnik* with

---

[13] The Court notes the similarities between the facts in *Howarth* to the case before the Court. In *Howarth*, Dr. Johnson testified it fell below the standard of care, regardless of locale, for an emergency room physician to fail to order a diagnostic test – a chest X-ray in that case – to rule out a life threatening illness. Here, Drs. Cummins and Patel are of the opinion that Drs. Paschall and Chun failed to order a thoracic MRI—a diagnostic test—in light of Mr. Garriott's symptoms, especially considering his lower body paralysis on April 2, 2015.

regard to the sufficiency of the deposition testimony reviewed. Next, Defendants claim *Dulaney v. St. Alphonsus Regional Med. Ctr.*, 45 P.3d 816 (Idaho 2002), supports their argument that the expert reports here lack sufficient foundation, but Defendants conveniently gloss over the reason the trial court in *Dulaney* excluded the portion of the expert's affidavit regarding the standard of care. There, the expert was an emergency room physician from Seattle. He consulted a Boise internal medicine specialist to obtain information regarding the local standard of care. The court explained the expert's testimony was properly excluded, because the expert had not familiarized himself with the local standard of care for either emergency room physicians or orthopedic surgeons, and the expert's own board certification in that specialty—although the same as the defendant physician's—was insufficient. *Dulaney*, 45 P.3d at 823–24. Those are not the facts here. Drs. Cummins and Patel, both board certified emergency room physicians, consulted a board certified family physician practicing emergency medicine.

In *Arregui v. Gallegos-Main*, 291 P.3d 1000 (Idaho 2012), the plaintiff sought care from a chiropractor in the Nampa-Caldwell area. Plaintiff's expert was a chiropractor practicing in California, and in the expert's affidavit, she stated she had contacted an unidentified local Idaho chiropractor to familiarize herself with the standard of care. The trial court struck the affidavit on the basis it lacked sufficient foundation for admissibility. *Arregui*, 291 P.3d at 1002. On appeal, the court upheld the decision, finding that, in addition to the conclusory nature of the statement, the expert's own deposition testimony indicated she had never spoken with an Idaho chiropractor, had

never been to Idaho, and had no idea whether the standards for chiropractic care were different in Idaho than in California. *Id.* at 1005.

That is not the case here. Dr. Johnson apparently is well-versed regarding the standard of care throughout Idaho, both in Level II trauma centers and rural hospitals, as well as everything in between. Drs. Cummins and Patel spoke with Dr. Johnson, not an unidentified person as in *Arregui*. Further, both expert witnesses are of the opinion, based on all they have reviewed and their conversation with Dr. Johnson, that the standard of care would be no different in any of Idaho's communities, and the standard would be the same throughout the United States, regarding the facts in this case. *See, e.g., Grover v. Smith*, 46 P.3d 1105, 1109 (Idaho 2002) (considering a basic standard would be applicable statewide). The Court is not faced with incomplete, nonspecific and conclusory statements that the court had in *Dulaney* and *Arregui*, especially considering the divergent facts in those two cases (and others referenced by Defendants).[14]

The Court notes there is no issue here regarding a lack of advanced technology, conditions unique to Kootenai County, or an area of specialization with which the expert witnesses are unfamiliar. *Grover*, 46 P.3d at 1109 (discussing under what conditions a local standard may fall below a national standard of care). While a small Idaho town may

---

[14] Defendants referenced the following cases: *Keyser v. Garner*, 922 P.2d 409 (Idaho Ct. App. 1997) (national standard); *Navo v. Bingham Mem'l Hosp.*, 373 P.3d 681 (2016) (conversation with Associate Director of Idaho State Board of Nursing insufficient); *Watts v. Lynn*, 870 P.2d 1300 (1994) (consult with local dentist who opined everyone in Idaho was using Sargenti Paste at the time of the incident); and *Dunlap by & ex rel. Dunlap v. Garner*, 903 P.2d 1296 (1994) (consult with local physicians about obstetrical issues in the case). The Court has reviewed these cases, and generally finds that the facts, as they relate to how the expert familiarized himself or herself with the standard of care, diverge from the facts here.

have less advanced technology than that in a larger city, thus necessitating a different local standard of care, here the issue is whether Drs. Chun and Paschall, when confronted with a patient exhibiting symptoms like Mr. Garriott's on March 31 and April 2, 2015, should have ordered a thoracic MRI. Kootenai Health had the capacity to perform MRI testing, and had radiologists available 24 hours a day. Kootenai Health attracted also physicians who had practiced emergency medicine in different parts of the country, and both Drs. Chun and Paschall indicated they approached medicine no differently at Kootenai Health than they had while practicing elsewhere.

Drs. Cummins and Patel, both board certified in emergency medicine, tie all of the above together. In their reports, they indicate the standard of care for evaluation and treatment of a patient like Mr. Garriott, presenting to the emergency department on March 31, and April 2, 2015, would be the same in any of Idaho's communities, and would be the same nationwide. Based upon the above, the Court concludes Drs. Cummins and Patel adequately established the foundation for their familiarity with the applicable community standard of care as it existed in March and April of 2015, in Coeur d'Alene, Idaho, as required by Idaho Code § 6-1013.

**3.      *Indeterminable Standard of Care***

Defendants alternatively argue Plaintiffs cannot establish the community standard of care at the time of Garriott's treatment was indeterminable. Defendants contend Plaintiffs have offered no evidence there are no "like providers" in the community serviced by Kootenai Health other than those physicians employed by Western Medical Associates, PLLC.

In certain circumstances where not a single medical provider is willing to consult with a plaintiff's expert regarding the standard of care, the standard becomes indeterminable and the plaintiff may look to other similar localities or outside the state. *Lepper v. Eastern Idaho Health Servs., Inc.*, 369 P.3d 882, 893 (Idaho 2016). However, the party must make a sufficient showing that concerted efforts have been made to secure information on the standard of care from a like provider, and those efforts failed due to the refusal of the providers to opine. *Id.* In such a case, common law principles guide the determination of the applicable standard of care. *Id.*

The concept of "community" refers to "that geographical area ordinarily served by the licensed general hospital at or nearest to which such care was or allegedly should have been provided." *Ramos v. Dixon*, 156 P.3d 533, 536 (Idaho 2007). The determination of the geographical area that constitutes the "community" is a factual determination made by the Court. *Ramos*, 156 P.3d at 536.

Defendants, in their reply brief, agree that the nearest licensed general hospital to provide care to Mr. Garriott was Kootenai Health in Coeur d'Alene, Idaho. However, Defendants argue also that the geographic area ordinarily served by Kootenai Health includes Spokane County, Washington, where Mr. Garriott resided at the time of his care, and the contiguous Idaho counties of Bonner County, Benewah County and Shoshone County. Defendants then contend that emergency care providers exist at Bonner General Health in Sandpoint, Idaho, Shoshone Medical Center in Kellogg, Idaho, and at several hospitals in Spokane County, including Valley Hospital, which operates a clinic in Liberty Lake that Mr. Garriott presumably drove by en route to Kootenai Health.

The Court is not inclined to accept Defendants' assertions in the absence of any facts indicating the community served by Kootenai Health encompasses a greater area, and would include Spokane County, Washington, or any of the other locations mentioned. Defendants' argument is not based on any facts or evidence in the record. Defendants' logic is also contrary to that accepted in *Ramos*. There, the court noted that the existence of a licensed general hospital in Idaho Falls would not preclude Idaho Falls from being within the geographical area served by a hospital in Blackfoot. *Ramos*, 156 P.3d at 536. In that case, the plaintiff's out of state expert contacted a physician in Idaho Falls to familiarize himself with the standard of care in Blackfoot. But, in the absence of evidence suggesting that the community served by Bingham Memorial Hospital in Blackfoot included Idaho Falls, a community about thirty miles from Blackfoot, the trial court declined to consider the testimony of Plaintiff's out of state expert. *Id.* Here, the Court similarly lacks evidence (and has been provided argument only) that the community served by Kootenai Health encompasses the areas of Spokane County, Bonner County, or Kellogg, Idaho,

Moreover, if the Court accepted Defendants' argument, then arguably Dr. Cummins, who practices emergency medicine in Seattle, Washington, is familiar with the standard of care in Spokane, Washington, and by extension, Kootenai County. Further, there would have been no reason for Dr. Milne, Defendants' expert, to confine himself to a consult with Dr. Tom Nickol, an emergency department physician practicing at Kootenai Health during March and April of 2015, to inquire about the applicable

community standard of health care practice applicable to the area served by Kootenai Health. (Dkt. 86-8 at 9.)[15]

The facts here are similar to those in *Hoene v. Barnes*, 828 P.2d 315 (1992). There, at the time of the plaintiff's surgery, the defendant physician was one of only six cardiovascular surgeons in the state of Idaho, and all six practiced together as part of the same professional association. The court concluded that, because all six surgeons practiced together, and they were the exclusive providers in Idaho for the type of surgery involved, there were no similar Idaho communities for the plaintiff's expert to consult. *Hoene*, 828 P.2d at 317.

Focusing on the facts here, the alleged negligence occurred in Coeur d'Alene, Idaho. The parties agree the hospital serving the Coeur d'Alene area, and the closest hospital to Mr. Garriott, was Kootenai Health. The applicable standard of care is that practiced in the geographical area ordinarily served by that hospital. Drs. Chun and Paschall were two of six providers of emergency medicine practicing in Coeur d'Alene, Idaho, at Kootenai Health. All six providers were employed by Western Medical Associates. Dr. Chun testified Western Medical Associates was the exclusive provider of

---

[15] Dr. Milne's expert report undercuts Defendants' argument here. First, the Court assumes, based upon the facts, that Dr. Nickol is one of the six members of Western Medical Associates, as only those six emergency doctors provided services to Kootenai Health. If the community served by Kootenai Health was larger than Kootenai County, there would have been no reason for Dr. Milne to confine himself to a consultation with one of the other six practitioners of Western Medical Associates. Second, Dr. Milne's report indicates he consulted with Dr. Nickol precisely because he was familiar with the standard of health care practice applicable to the area served by Kootenai Health, which only contracted with Western Medical Associates and its six physicians. If that is the case, it stands to reason that the community served by Kootenai Health is limited to Kootenai County, at least with regard to emergency medicine in March and April of 2015.

emergency room services at Kootenai Health. Dr. Paschall testified the physicians employed by Western Medical Associates in 2015 did not provide emergency room services to any facilities other than Kootenai Health.

Under these facts, and absent other facts demonstrating otherwise, the standard of practice in the community ordinarily served by Kootenai Health was indeterminable. From reviewing Dr. Johnson's deposition testimony in *Howarth*, which is in the record, the Court understands Dr. Johnson has practiced in various communities throughout Idaho, both large and small, and has similar credentials to those of Drs. Chun and Paschall. Accordingly, the telephone conversation with Dr. Johnson was appropriate.

## CONCLUSION

The expert reports of Drs. Cummins and Patel provide a sufficient showing of actual knowledge of the community standard of care, and have established the foundation for the admissibility of their opinions as expressed in their reports. Alternatively, under the facts before the Court, the standard of care applicable to the community served by Kootenai Health was indeterminate. The Court concludes the opinions of Drs. Cummins and Patel, as expressed in their expert witness reports, are admissible.

## <u>ORDER</u>

**NOW THEREFORE IT IS HEREBY ORDERED:**

Defendant's Motion for Summary Judgment (Dkt. 86) is **DENIED**.

DATED: August 2, 2017

Honorable Candy W. Dale
United States Magistrate Judge